UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Stephen Perkola,

      Plaintiff,

v.                            Case No. 16-12602

The University of Michigan Board
of Regents, *et al.*,            Sean F. Cox
                              United States District Court Judge

      Defendants.
_____/

## OPINION & ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Stephen Perkola is employed by the University of Michigan as a Police Sergeant

with the University's Police Department at its Dearborn, Michigan campus.  After he applied for

and was denied a promotion to Deputy Chief at the Dearborn campus, he filed this action against

Defendants, asserting reverse race and sex discrimination claims under both Title VII and

Michigan's Elliott Larsen Civil Rights Act ("ELCRA").  The matter is currently before the Court

on Defendants' Motion for Summary Judgment, following the close of discovery.  The parties

have fully briefed the issues and the Court heard oral argument on March 22, 2018.  As

explained below, the Court shall GRANT THE MOTION IN PART AND DENY IT IN PART.

The Court shall GRANT the motion to the extent that it grants summary judgment in

Defendants' favor as to Plaintiff's reverse sex discrimination claims under Title VII because

Plaintiff has failed to meet his heightened burden of establishing a prima facie case as to a

reverse sex discrimination claim under Title VII.  The Court will DENY the motion in all other

respects. As such, Plaintiff's Title VII reverse race discrimination claim, along with Plaintiff's reverse race and sex discrimination claims under the ELCRA, will proceed to a jury trial.

## BACKGROUND

Plaintiff Stephen Perkola ("Plaintiff") filed this action on July 12, 2016. His First Amended Complaint is the operative complaint and names the following seven Defendants: 1) the University of Michigan Board of Regents; 2) Anna Grbic; 3) Kevin Williams; 4) Renee Mainor; 5) Reetha Raveendran; 6) Dr. Debra Hutton; and 7) Eddie L. Washington, Jr. Plaintiff's First Amended Complaint asserts race and sex discrimination claims under both Title VII and Michigan's ELCRA.

There were three different scheduling orders in this case. The final one provided that discovery closed on September 29, 2017. (D.E. No. 16).

On October 30, 2017, Defendants filed this Motion for Summary Judgment. This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(D.E. No. 16 at 2-3). The parties complied with the Court's practice guidelines for motions for summary judgment such that Defendants' motion includes a "Statement of Material Facts Not In Dispute" ("Defs.' "Stmt.") and Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" ("Pl.' s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Plaintiff, the non-moving party*.

Plaintiff is a white male. (Defs.' & Pl.'s Stmts. at ¶¶ 14-15). Plaintiff applied for a full-time Police Sergeant position at the University's Dearborn, Michigan campus and began working for the University's Dearborn Police Department in April of 2011. (*Id*. at ¶ 2 & 8).

Plaintiff is still working as a Sergeant at the University's Dearborn Police Department today. (Defs.' & Pl.'s Stmts. at ¶ 10). In that position, Plaintiff supervises two police officers, three security officers, and one dispatcher. (*Id*. at ¶ 12).

When Plaintiff began working at the University, he reported to Lt. Kenneth Paris. (*Id*. at ¶ 30).

In October of 2013, Chief Gordon retired and Lt. Paris became Interim Chief, still acting as Plaintiff's immediate supervisor. (Defs.' & Pl.'s Stmts. at ¶ 33).

Defendant Renee Mainor is a black female (*see* Defs.' Stmt. at ¶ 3) who works in the University's Human Resources Department. Plaintiff testified that, shortly after Chief Gordon retired, Mainor asked Plaintiff if he knew of any good candidates for the position of Chief, and after Plaintiff responded affirmatively, Mainor asked Plaintiff if he "knew of any good black candidates." (Defs.' & Pl.'s Stmts. at ¶ 34).

Lt. Paris applied for the Chief of Police position; however, when he was not selected, he retired. (Defs.' & Pl.'s Stmts. at ¶ 37).

Kevin Williams, a black male, became the Chief of Police for the University's Dearborn Police Department in May of 2014. (*Id*. at ¶ 38). Plaintiff then reported directly to Chief Williams for approximately one month because there was no Lieutenant or Deputy Chief. (*Id*. at ¶ 39).

Plaintiff, at times, served as Interim Police Chief while the Police Chief was gone. (James Dep. at 25-26).

Shortly after Chief Williams arrived at the Dearborn campus, he spoke to Eddie Washington, the University's Executive Director of Public Safety,[1] and Raymond Hall and Robert Neumann, Police Chiefs at the Flint and Ann Arbor campuses, respectively, to see if he could get help at the Dearborn campus. (Defs.' & Pl.'s Stmts. at ¶ 42). Williams testified that he knew, at that time, that he wanted a deputy police chief at Dearborn. (Williams Dep. at 34-35).

Crystal James[2] was sent to the Dearborn campus in early 2014. Williams had never met James when the decision was made to temporarily assign her to the Dearborn campus. (Defs.' & Pl.'s Stmts. at ¶ 45).

_____

[1]Defense Counsel acknowledged at the March 22, 2018 hearing that Washington is a black male.

[2]Crystal James attended the Detroit Police Academy and then worked the City of Detroit's Police department. She began working for the University's Police Department, at the University's Ann Arbor campus, in 1992. (James Dep. at 10-13; Defs.' Ex. 22). While at the University, James was promoted to Sergeant in 1997, and was promoted to Lieutenant in 2003. In 2003, she worked as a patrol lieutenant. From 2009 to 2013, James was the 9-1-1 communications supervisor. (*Id*.).

James testified that she was told she was being sent to the Dearborn campus because Chief Williams had requested help with the day-to-day operations of the department and that is what her work entailed. (James Dep. at 12-13).

Williams testified that after James came to Dearborn, he mentored James to help develop her to become a deputy police chief. (Williams Dep. at 34-35). Williams testified that he did not, however, believe that James was qualified to become a deputy police chief at that time because she lacked a college degree:

> Q. What did Crystal James need mentoring in?
> A. In this particular case this was mentoring to develop her to be a police chief.
> Q. A deputy police chief, right?
> A. Yes. Yeah, sure.
> Q. You knew you wanted a deputy police chief, right?
> A. Oh, yes.
> Q. And she would be mentoring towards that position, correct?
> A. Yes.
> Q. Okay. You were in a position where you knew you were going to ask for the position – or you had just asked for the position to be created of deputy police chief, right?
> A. Yes.
> Q. And this was the perfect opportunity to have the person that was here and mentor her as to what you were going to need for the future, correct?
> A. No.
> Q. No?
> A. No.
> Q. Why not?
> A. Because she wasn't qualified in my mind.
> Q. She wasn't qualified in your mind in the summer of 2014 to be a deputy police chief, correct?
> A. Yes, based upon education specifically.
> Q. Okay. Anything else?
> A. No.
> Q. Okay. It was just on education that she wasn't qualified. Anything else?
> A. No.
> Q. What was it about education?
> A. I do not believe, and I've never believed, that a person should be an executive in the police department without having a college degree.

(Williams Dep. at 35-36).

Plaintiff testified that James continued to hold the rank of lieutenant during her temporary assignment at the Dearborn campus, and that her role was essentially the same as the role Lt. Paris performed before retiring:

> Q.   Do you know what her rank was in Ann Arbor?
> A.   Lieutenant.
> Q.   Do you know if that rank changed when she came to Dearborn?
> A.   She acted in the capacity of deputy chief, but she was still a lieutenant.
> Q.   When you say acted in the capacity of deputy chief, what do you mean?
> A.   She would set policies. She was setting procedures for the department, even though she wasn't technically a member of the University of Michigan Dearborn Police Department . . .

(Pl.'s Dep. at 86-87).

On May 27, 2014, Williams announced that he was eliminating the Lieutenant position (formerly held by Lt. Paris) and creating a Deputy Chief position. Williams told Plaintiff that he was qualified for the position and urged Plaintiff to apply for it. (Defs.' & Pl.'s Stmts. at ¶ 53-54).

James returned back to the University's Ann Arbor campus in August of 2014. (Pl.'s Dep. at 88).

The University posted the Deputy Chief position for Dearborn on August 22, 2014, with a closing date of September 5, 2014. The job posting listed the "working title," of the position as "Deputy Chief of Police" but the "Job Title" of the position as "Police Lieutenant." (Defs.' Ex. 10).

The job posting detailed the "Essential Qualifications" for the position, which included, among other things:

• A bachelor's degree in Criminal Justice or related field or an equivalent

combination of education and experience
• 5+ years of law enforcement experience
• 3+ years of supervisory experience
• Excellent interpersonal skills and oral and written communication skills

(Defs.' & Pl.'s Stmts. at ¶ 56).  The job posting also listed the duties of the Deputy Chief

position as including:

> - Establishes and maintains plans and operations in compliance with university,
> state and federal requirements;
> - Supervises a team of direct reports; including managing work performance for
> completeness, accuracy and compliance within established university and
> departmental standards;
> - Completes project assignments from Chief concerning policy construction and
> development, security needs/issues;
> - Plans for responding to major crisis events and incidents on campus acting as
> part of a university incident management team or crisis management team;
> - Serves on various University and Local/State law enforcement committees;
> - Assists in developing, recommending, and implementing policies and
> procedures for the department. Serve in advisory capacity to Chief and other
> university officials for public safety concerns and methods for increased
> efficiency;
> - Assists in departmental fiscal matters related to operations, payroll, purchasing,
> and other areas of the budget;
> - Assists with planning for major all (sic) special events; athletic, social, or of a
> cultural nature; with focus on crowd control, traffic control and security
> operations; providing guidance and direction, ensuring adequate staffing, space
> and facilities for the subsequent performance of duties; and
> - Performs non-law enforcement duties specific to campus needs.

(*Id*. at 57).

In total, the University received 62 applications for the Deputy Chief position, including

Plaintiff and Crystal James.  (Defs.' & Pl.'s Stmt. at ¶ 58).

Plaintiff and James each submitted a cover letter and copy of their resume when they

applied for the position.

James's cover letter expressed interest in the Dearborn Deputy Chief of Police position

and included that "[i]n June 2014, I was asked to assist the Chief of Police at the University of

7

Michigan, Dearborn Police Department (UMD) transition in a temporary Interim Lieutenant position working directly with him. In that capacity, I served as acting Chief of Police during the Chief's absence without issue." (D.E. No. 18-22 at Pg ID 342). Her attached resume indicated that she anticipated receiving a Bachelor of Science Degree from Central Michigan University in June of 2015.[3] It further indicated that James had worked for the University since 1992, and that she had been a Lieutenant since 2004.

Plaintiff's cover letter expressed interest in the position and stated that he had "over 28 years of progressively responsible experience in Law Enforcement," and stated:

> As a member of the Troy, MI, Police Department I had the opportunity to be Commander in Charge of all divisions of the police department including Executive Administration, Detective Bureau, SWAT Team, Commander of a Federal Crime Suppression Undercover Street Crimes Unit, Patrol, Internal Affairs, Training Division Commander, Commander in Charge of the Community Policing Unit, and many other units/divisions/teams with-in the police department. I achieved the rank of Lieutenant/Commander in the Troy Police Department (approximately 165 sworn personnel) before I accepted an early retirement package. I also have experience as the Deputy Chief of Police for a smaller agent (Springport Twp. Police Department).

(D.E. No. 18-25 at Pg ID 362). His resume included his various positions and his educational background. Plaintiff had a Bachelor's degree in criminal justice, and had graduated from the Northwestern University Executive School of Staffing Command. (*Id.; see also* Pl.'s Dep. at 34). At that time, Plaintiff has been employed by the University for approximately three years.

The University set up a Search Committee comprised of four individuals: Renee Mainor (who was employed as a Human Resources Consultant at the University)[4], Debra Hutton

---

[3]During this case, James testified that she did not complete her college degree until June of 2016 and, therefore, she did not have a college degree in 2014. (James Dep. at 8-9)

[4](*See* Pl.'s Ex. 28).

(Director of Counseling and Disability Services), Reetha Raveendran (Director of Student

Engagement), and Sarah Elhehou (a student, who was the Student Government President).

None of those individuals had any experience or background in law enforcement.  (3/22/18 Hrg.

Tr.).

As to the student on the Search Committee, Mainor testified that "she didn't participate

from the beginning to the end," and that the other members "were more or less schooling her,

telling her what we were looking for."  (Mainor Dep. at 6-7).

Each member of the Search Committee was given all 62 applications. Prior to meeting

with the Committee to discuss the candidates, Mainor identified those candidates who did not

meet the minimum qualifications or whose qualifications did not seem competitive with the rest

of the pool, to help focus the discussion and asked the Committee members to identify those

candidates they thought should be discussed for potential advancement to a phone interview.

Altogether, Mainor determined that 22 candidates did not meet the minimum qualifications, and

an additional 19 were not sufficiently qualified to be considered further.  Plaintiff and Crystal

James were both among the 21 candidates who were considered for further discussion.  (Defs.' &

Pl.'s Stmt. at ¶¶ 57-63).

The Committee then met to discuss those candidates that each member thought should be

seriously considered.

Mainor came to the meeting with Plaintiff on her short list of candidates to be discussed,

because "after reviewing his resume [she] decided he was one of [her] selected that [she] thought

should be seriously considered by the search committee."  (Mainor Dep. at 6-7).  Hutton and

Raveendran did not have Plaintiff on their short lists.

The Committee members then discussed their top candidates, and there was quite a bit of overlap. The Committee decided to advance seven candidates to phone interviews to take place on September 22, 2014. Plaintiff was not chosen for advancement to a phone interview; James was one of the seven who moved on in the process. (Defs.' & Pl.'s Stmt. at ¶¶ 64-68).

Mainor testified that one of the things that resulted in James getting an initial phone interview over Plaintiff was "[t]he fact that she was the interim chief of police" at the Dearborn campus. (Mainor Dep. at 17).

James then had an initial telephone interview with the Search Committee Members.

Hutton testified that she was aware that James was black and was aware of her, as James had been "acting as interim police chief." (Hutton Dep. at 15-16). Hutton further testified:

| | |
|---|---|
| Q. | Okay. You and Reetha both had questions about why Crystal was going to the final round? |
| A. | Well, we had some concerns. |
| Q. | What were your concerns? |
| A. | She did not interview well. |
| Q. | What else? |
| A. | We left her on the list as a courtesy. |
| Q. | Courtesy to whom? |
| A. | To her. |
| Q. | What do you mean? |
| A. | Because she had served here. I think that Reetha and I – and I can't speak for Renee – did not feel that she was a strong candidate. |
| Q. | She didn't have the qualifications compared to others basically, correct? |
| A. | She did not interview as well as others. |
| Q. | She also didn't have the qualifications in your opinion; am I correct? |
| A. | I'm not going to go that far. But . . . |
| Q. | Did she have the qualifications compared to others if you actually know? |
| A. | I don't think that she was as qualified as the others. |

(Hutton Dep. at 32-33).

Search Committee Member Raveendran testified that she thought James's phone interview was "mediocre," that she did not think James was a qualified candidate, but that she

"acquiesced" in putting James through to the live interview stage:

> Q.    Do you recall telling anyone that you did not think that Crystal was an appropriate candidate?
> A.    Yes, I recall.
> Q.    And did you explain that you felt that her phone interview was mediocre?
> A.    Yes. That is one of my favorite words.
> Q.    Did anybody in the group say that they had worked with Crystal James before?
> A.    Which group?
> Q.    The search or hiring committee?
> A.    No.
> Q.    Do you recall telling anyone that you acquiesce to group in terms of putting deputy chief James' name forward?
> A.    Yes.
> Q.    Do you remember who you told that to?
> A.    To the search committee.
> Q.    Okay. So you agreed to put her forward even though you didn't believe that she was a qualified candidate; is that correct?
> A.    That is correct.
> Q.    In fact, you did not think she should be invited for an on campus interview; is that correct?
> A.    That is correct.
> Q.    Okay. Did you, yourself, ever take part in an on campus interview with her?
> A.    I'm going to say I do not recall.

(Raveendran Dep. at 19-20). Raveendran further testified:

> Q.    In your role on the hiring committee did you understand that once the hiring committee gave a list for in-person interviews that somebody other than the hiring committee was going to be making the actual decisions about who would be chosen off that list?
> A.    Yes. We found out. Mm-hmm.
> Q.    And you understand that the hiring committee, even if you had a favorite candidate on that list, somebody else would be able to make their own decisions about that list; is that right?
> . . . .
> THE WITNESS: that is correct.
> . . . .
> Q    Did anybody ever tell you who was going to be making that decision?
> A.    Not explicitly.
> Q.    What do you mean not explicitly?
> A.    It was not mentioned. It was not articulated.

> Q.     Did you have an understanding?
> A.     As an intelligent human being I think anyone would.
>  . . . .
> A.     My speculation was that since we had been asked to cease and desist that the hiring manager would make the final decision.
> Q.     Who is the --
> A.     The hiring manager would be Chief Williams.

(*Id.* at 38-40).

On September 24, 2014, James sent an email to Mainor, regarding the Deputy Chief Position, that stated "[t]hank you for the opportunity to complete a preliminary interview for the position. I have decided to withdraw my name from further consideration." (Defs.' Ex. 25).

On September 29, 2014, Mainor sent Grbic, the University's Director of Human Resources at the time, an email that stated, in pertinent part:

> The hiring panel: Deb Hutton Director of Counseling, Reetha Raveendran, Director of OSE, Sarah Elhelou, President of the Student Union, and myself. We conducted phone screen interviews with 7 candidates and narrowed it down to 4 who we invited for campus interviews (with hiring panel) on Wednesday, October 2nd and 3rd. The hiring panel will decide who moves forward to interview with Kevin next week.
>
> Please let me know if you have questions,
>
> Renee
>
> P.S. Crystal James withdrew her application

(Pl.'s Ex. 9). Grbic then asked Mainor, "Why did Crystal withdraw?" (*Id.*) Mainor responded that "[a]fter the telephone interview Crystal called and left me a message saying she was withdrawing and no longer wanted to be considered. I don't know why we were planning on sending her forward to the next round." (Pl.'s Ex. 6).

Hutton testified that the Search Committee did not discuss reaching out to James after she withdrew from consideration. (Hutton Dep. at 31).

But Grbic, who was not on the Search Committee but was the University's Director of

Human Resources Department at that time, testified that she contacted James:

> Q. Did you call a Crystal James in 2014 and have her put her name back into the running –
> A. Yes.
> Q. – for Deputy Police Chief?
> A. Yes, sir.
> Q. At whose instruction?
> A. No ones.
> Q. Why did you do it?
> A. Because I believed that she was a qualified candidate and should see the process through.
> Q. What document – strike that.
> How did you know that – or what led you to believe she was a qualified candidate?
> A. She had been serving on our campus assisting the chief for some time.
> . . . .
> Q. You knew that Crystal James was African-American, correct?
> A. Yes, sir, I did.

(Grbic Dep. at 7-9). James then re-entered the process. (Defs.' & Pl.'s Stmt. at ¶ 87).

On October 13, 2014, Chief Williams forwarded an email from someone at the

University, who wanted to recommend one of the other applicants for the position and stated, "I

have not responded and am forwarding this to you for whatever action you deem appropriate."

(Pl.'s Ex. 30). Grbic then responded to Chief Williams, Mainor, and Jeff Evans, stating,

"[b]efore we respond let's discuss the interview feedback. *I have a clear front runner* and don't

like the idea of interviewing candidates for the sake of interviewing them if we don't deem them

a serious candidate." (*Id.*) (emphasis added).

Initially, the Search Committee intended to conduct in-person interviews of all five of the

persons who passed the phone interview stage, "prior to getting a list to move forward to Kevin

Williams, the chief of police." (Mainor Dep. at 25; Defs.' & Pl.'s Stmt. at ¶ 81). They only did

once such interview, with Donald Johnson, and they decided he would not move forward.  (*Id.*).

But then Grbic suggested that the Search Committee not make all of the candidates come to campus twice, so the remaining candidates were all forwarded as finalists.  (Defs.' & Pl.'s Stmt. at ¶ 83).  That meant that, except for Johnson, *all candidates who were selected for an initial telephone interview moved forward as finalists – without having any further interviews by the Search Committee.*

Of the finalists that moved forward, James was the only woman and the only minority candidate.  (Mainor Dep. at 42). Of the finalists, James was the only one that lacked a college degree.  James Saylor had a Bachelor's Degree (D.E. No. 18-18 at Pg ID 321) and Jason Forsberg and Robert Kerr each had both a Bachelor's Degree and a Masters Degree (D.E. No. 18-19 at Pg ID 327 & D.E. No 18-21 at Pg ID 339).

Chief Williams instructed Human Resources to send him the finalists.  (Defs.' & Pl.'s Stmt. at ¶ 90).

Following an in-person interview, Chief Williams selected James for the position. (Williams Dep. at 41).  Williams testified as follows:

> Q.  Okay.  Tell me what background of Crystal James have that made her competent to be a deputy chief as opposed to Sergeant Perkola?
> A.  As opposed to James Perkola.  As I recall Crystal James had somewhere in the ballpark of two decades of experience at the University of Michigan.  Crystal was a lieutenant that Steven Perkola worked for.  So he was her subordinate.  She had an exceptional knowledge of how University of Michigan operates that includes but is not limited to procurement, SPGs, how the university functions.  I know how to run a police department but I didn't know the University of Michigan.  I knew that while we were working together and she was a lieutenant she would know the various entities at least at Ann Arbor that could provide us the information, access to training, and the networking that we needed to move our department here forward.

(Williams Dep. at 24).

The University ultimately notified the department's officers that James had been selected for Deputy Chief on October 31, 2014, and she began working under that title shortly thereafter. (Defs.' & Pl.'s Stmt. at ¶ 95).

Plaintiff testified that he asked Chief Williams why he was not given the opportunity to interview for the Deputy Chief position and that Williams "said that he had nothing to do with hiring." (Pl.'s Dep. at 25-26).

Plaintiff then filed an internal complaint with the University. A June 18, 2015 Memorandum sent to Chancellor Little at the University, authored by Senior Associate Director Pamela Heatlie, addressed Plaintiff's complaint and her investigation of it. (Defs.' Ex. 29). Among other things, that memorandum stated that Heatlie interviewed Chief Williams on April 28, 2015 and that:

1)      "When asked about the search process, Chief Williams stated that he wanted the successful candidate to have a Bachelor's degree and noted that Ms. James does not have a Bachelor's degree. Chief Williams says that despite his request, the University would not allow him to list a Bachelor's degree as a minimum qualification for the position," (*Id*. at Pg ID 388);

2)      it was Eddie Washington, the University's Executive Director, Division of Public Safety and Security that "decided to assign Ms. James to Dearborn campus," and

3)      "Chief Williams says that Mr. Washington asked him to mentor Lt. James while she was on his campus and he said he would."

(*Id.*).

It also stated that Plaintiff "applied for the Deputy Chief position, but fell out of consideration at the point in time when the hiring panel decided which candidates would receive telephone interviews. While each hiring member independently created a short list of candidates

whom they wished to receive a phone interview, *none of the hiring panel members had placed Complainant on their short list.*"  (*Id*. at Pg ID 391 & 386) (emphasis added).  The memorandum stated "According to the panel members, [Plaintiff] was not discussed during this meeting, *because nobody had put him on their short list* of potential phone interviewees." (*Id*.) (emphasis added).  Heatlie's ultimate conclusion was that Plaintiff was not eliminated as a candidate for the Deputy Chief position due to race.

Plaintiff attached what appears to be a section of Heatlie's original draft of the above memorandum.  (Pl.'s Ex. 12).  It appears that the original draft stated that "Mr. Washington ultimately decided to *assign Ms. James to the Interim Deputy Chief position*," that Chief Williams says that Mr. Washington asked him to mentor *"Interim Deputy Chief James* while she was on his campus and he said he would."  (*Id*.)  (emphasis added).

Another document produced by Plaintiff (Pl.'s Ex. 32) appears to be a May 1, 2015 e-mail from Chief Williams to Heatlie wherein he states "I have reviewed the document and I have attached your document with minor suggested changes primarily related to how we refer to Crystal James," and states that "[w]hen Crystal was on loan to us last summer, she was still a Lieutenant and no Deputy Chief position has been approved.  Therefore, she was a Lieutenant, functioning as a Lieutenant in a position that was upgraded to Deputy Chief with a different job description and duties." (*Id*.).  Chief Williams did not, however, ask Heatlie to revise the portion of the memorandum that stated that Williams told her Washington had asked him to mentor James or that Washington had selected James for the interim position.

During his deposition in this case, Washington denied that he asked Williams to mentor James.  (Washington Dep. at 25).

**Standard of Decision**

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

**ANALYSIS**

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to proceed with a sex or race discrimination claim.

Although Plaintiff's brief includes an assertion that his "claims are supported by circumstantial and direct evidence" (*see* Pl.'s Br. at 1), his response brief focuses on circumstantial evidence, as shown by his "Statement of Issues Presented." (*Id.* at vi). And Plaintiff has not directed the Court to any evidence that would constitute actual direct evidence as to his not having received mentoring, the interim position, or the promotion at issue because of his race or sex.

Discrimination claims supported by circumstantial evidence are examined using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. If the defendant articulates such a reason, then the burden shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination.

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).

Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are a pretext for unlawful discrimination. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

**I.  Can Plaintiff Establish A Prima Facie Case Of Failure To Promote, Based On Gender Or Race Discrimination, In Violation Of Either Title VII Or The ELCRA?**

In their Motion for Summary Judgment, Defendants challenge Plaintiff's claim that he was improperly denied a promotion to the position of Deputy Chief of the Dearborn Campus[5] in

---

[5]The Court notes that in response to Defendants' motion, Plaintiff states that he is also asserting a claim "that he was not given the same mentoring opportunities" as James due to his "race or gender" (Pl.'s Br. at 6) and appears to assert that he has a separate discrimination claim based on his not having gotten the temporary placement that James got at the Dearborn campus, to help Chief Williams with day-to-day operations. (*See* Pl.'s Br. at 9) (asserting that the "first phase of discrimination was the selection of James as Interim Deputy Chief."). Plaintiff's First Amended Complaint included allegations as to such claims. (*See, e.g.*, Pl.'s First Am. Compl. at ¶¶ 26-29, 41-42 68). But Defendants' motion did not address such claims. As such, Defendants' motion has not challenged a claim based upon the mentoring/interim assignment and the Court has no basis for making a ruling as to such a claim.

violation of Title VII and th ELCRA.

Under the *McDonnell Douglas* framework, the "plaintiff must first establish a prima facie case of discrimination, the elements of which vary slightly depending on the theory asserted." *Philbrick v. Holder*, 583 F. App'x 478, 482 (6th Cir. 2014).

"In a failure to promote employment discrimination case, the Sixth Circuit has modified the elements of the test to fit the specific context," and it requires that the plaintiff show: 1) he is a member of a protected class; 2) he applied for and was qualified for a promotion; 3) he was considered for and denied the promotion(s); and 4) an individual of similar qualifications who was not a member of the protected class received the promotion(s) at the time the plaintiff's request for the promotion was denied. *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240 (6th Cir. 2005).

Here, Plaintiff is a member of classes (male sex and white race) that are protected under both Title VII and the ELCRA. It is undisputed that Plaintiff applied for the position of Deputy Chief. Defendants acknowledge that Plaintiff was at least minimally qualified for the position at issue. (*See* Defs.' Br. at 5, "Defendants agree that Plaintiff was qualified for the position of Deputy Chief and was not given that position."). Plaintiff was considered and ultimately was not selected for the position, thus satisfying the third element.

The final prong, "whether an individual of similar qualifications who was not a member of the protected class received the promotion" is what is in dispute as to Plaintiff's ability to establish a prima facie case. (*See* Defs.' Br. at 11-12). James, a black female, is outside of Plaintiff's protected classes and received the promotion. The issue is whether Plaintiff can show that he and James had "similar qualifications."

The Sixth Circuit has held that "it is incumbent upon the plaintiff to establish that [ ]he and the non-protected person who ultimately was hired for the desired position had similar qualifications." *White,* 429 F.3d at 242. That is, some comparison between Plaintiff and James "is therefore necessary in considering the forth prong of the prima facie case." *Id*. at 243. As Defendants note, other Sixth Circuit decisions explain that a plaintiff does not meet this fourth prong by simply showing that he is *minimally* qualified for the position or was a "viable candidate;" that is covered in prong two. *See, e.g., Crane v. Mary Free Bed Rehab. Hosp*., 634 F. App'x 518, 525 (6th Cir. 2015). Rather, prong four requires that the plaintiff show that he or she was "similar in all of the *relevant* respects" to the person selected and the Court "must 'conduct an independent review of the relative qualifications of the plaintiff and the person selected for the position based on the evidence presented in order to determine whether the plaintiff has satisfied the fourth prong.'" *Id*. (citing *White, supra*). "Candidates do not have similar qualifications when one candidate has objectively 'superior experience in material and relevant respects' of attributes associated with the position sought." *Crane, supra* (citing *White, supra*).

Defendants' motion asserts that Plaintiff cannot establish this prong because he cannot meet his burden of showing that he was similarly-situated in all relevant respects to James, the applicant who was selected. (Defs.' Br. at 13-15). Defendants note that while Plaintiff had been a Sergeant with the University's police force for approximately three and half years when the Deputy Chief position was filled, James held a higher rank and had more experience at a university setting.

In response, Plaintiff stresses that while he had less time at the University, he had more

total years of law enforcement experience, including having worked for the City of Troy as a Lieutenant, where he had experience serving as Commander in Charge of all divisions of that 165-officer police department and including having served as a Deputy Police Chief for the Springport Township Police Department for two years.  (*See* Defs.' Ex. 24).  Plaintiff argues that his prior experience includes what amounts to at least equivalent experience with James.  In addition, unlike James, Plaintiff had a college degree at the time the job was being filled.

The Sixth Circuit has stressed that the burden at the prima facie case is not intended to be onerous.  And the cases that Defendants cite in support of their motion are not persuasive as to their argument that Plaintiff has not created a genuine issue of fact for trial as to this issue.

For example, in *Wierengo v. Akal Sec., Inc*., 580 F. App'x 364 (6th Cir. 2014), the Sixth Circuit affirmed the trial court's ruling that the plaintiff had not created an issue of fact on this prong.  In doing so, however, the Sixth Circuit noted that the plaintiff's "brief in the district court and on appeal simply state[d] that she had qualifications similar to those selected" and did "not provide any evidence discussing" the successful candidate's qualifications.  The court went on to discuss the evidence presented by Defendants on the issue, and affirmed the ruling, but its discussion appears to reflect the failure to present evidence was the real basis for affirming the ruling:

> Even assuming Wierengo was qualified for the positions, she has not shown that she had similar qualifications to Cuperus and Quist, the two men who were hired instead. *See White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 243 (6th Cir.2005) ("Some comparison between [the plaintiff and the person ultimately selected] is therefore necessary in considering the fourth prong of the *prima facie* case. Engaging in such a comparison does not impermissibly conflate the two stages of the *McDonnell Douglas* test...."). Wierengo's briefs in the district court and on appeal simply state that she "had qualifications similar to those who were selected." She does not provide any evidence discussing Quist's promotion to assistant lead security officer or his qualifications. And, as pointed out by Akal,

21

Cuperus—who was promoted to new site supervisor—had thirty years of police experience, including fourteen years of supervisory experience as a sergeant and detective sergeant. Comparatively, Wierengo only had twelve years of police experience and no experience in a police supervisory role. *Although Wierengo's burden at the prima facie stage is not onerous, she must provide some evidence supporting all four elements of her case. She has not done so.*

*Id.* at 371 (emphasis added).

Defendants also cites Judge Robert Cleland's decision in *Ray v. Oakland Cnty.*, 2008 WL 4104324 (E.D. Mich. 2008), as supporting their position that Plaintiff has failed to create an issue of fact for trial on this fourth prong. While Judge Cleland agreed that the plaintiff had not met her burden of establishing that she had sufficiently similar qualifications as the person chosen for the position, and described how the person chosen had superior qualifications, he also expressly noted that the Plaintiff, "perhaps in recognition of the unquestionable nature of this point, neither attempts to argue the matter in her brief nor even mentions the phrase 'similarly situated.'" *Id.* at *3.

Moreover, while the Sixth Circuit affirmed Judge Cleland's summary judgment ruling in that case, in doing so it *assumed without deciding* that the plaintiff could meet the fourth element of a prima facie case, and affirmed based on failure to meet her burden as to pretext. *Ray v. Oakland Cnty. Circuit Court*, 355 F. App'x 873, (6th Cir. 2009). ("Even if we were to conclude that the district court erred in finding that plaintiff failed to make out a prima facie case, we are convinced she can not satisfy the requirement of establishing pretext.").

"In assessing whether Plaintiff has satisfied the fourth element," this Court conducts an independent review of the relative qualifications of Plaintiff and James based on the evidence presented. *Weeks v. Michigan, Dept. of Commty. Health*, 587 F. App'x 850, 856 (6th Cir. 2014). But that comparison is "not the sort of close comparison that might include consideration of the

employer's evaluation of subjective traits or other details about why the non-protected person was in fact selected over the plaintiff." *Id.*  Viewing the facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has created an issue of fact as to whether he and James are similarly situated.

"While their relative qualifications were unquestionably different," this Court does not believe it can "say with certainty that one candidate was objectively superior" for the Deputy Chief position. *Weeks,* at 856.  That is, this Court concludes that "a reasonable jury could find that Plaintiff was at least as well-qualified as" James[6] and, as a result, Plaintiff has satisfied his burden of proof on the fourth element.  *Id.*

> **A.**  **Plaintiff Has Established A Prima Facie Failure-To-Promote Claim Under The ELCRA, As To Both Race And Sex.**

Because the Court finds that there is an issue of fact for trial as to that fourth prong, then Plaintiff is deemed to have established a prima facie case of failure-to-promote under Michigan's ELCRA, without any additional showing. That is because, as Defendants acknowledge, no additional showing is required at the prima facie stage under the ELCRA when a reverse race or sex discrimination claim is asserted.  (Defs.' Br. at 5).

> **B.**  **Plaintiff Meets His Heightened Burden, Under Title VII, As To His Reverse Race-Discrimination Claim, But Not As To His Reverse Sex-Discrimination Claim.**

Unlike the ELCRA, for purposes of Title VII, Plaintiff has to do more to establish his prima facie case of failure-to-promote.  That is because this case involves both a "reverse" race discrimination claim and a "reverse" sex discrimination claim under Title VII and, therefore,

---

[6]Indeed, Mainor, the sole Human Resources professional on the Search Committee, had Plaintiff on her list of top candidates.

Plaintiff "faces a higher burden" in establishing his prima facie case. *Philbrick v. Holder*, 583 F. App'x 478,483 (6th Cir. 2014).

In a reverse race discrimination case, there are additional burdens as to the first and the fourth prongs of the test. *Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 255 (6th Cir. 2002); *Morris v. Family Dollar Stores of Ohio, Inc*., 320 F. App'x 330, 339 (6th Cir. 2009). To satisfy the first prong of the test, the plaintiff must demonstrate "background circumstances" to support the suspicion that the defendant is the "unusual employer who discriminates against the majority." *Morris, supra*. To satisfy the fourth prong, the plaintiff must show that Defendant treated minority employees who were similarly situated to Plaintiff more favorably than he was treated. *Id.* This same heightened-prima-facie burden also applies to reverse sex discrimination claims (claims brought by a male) under Title VII. *See, e.g., Simpson v. Vanderbilt Univ*., 359 F. App'x 562, 568-69 (6th Cir. 2009).

Based upon the record evidence before this Court, Plaintiff meets his heightened burden as to his reverse race discrimination claim.

As to the first prong, the Sixth Circuit has held that the mere fact that an adverse employment decision was made by a member of a racial minority is sufficient to establish the heightened burden. *Morris, supra*, at 340. Here, the requisite background circumstances exist because Chief Williams is black and he made the decision to hire James, who is also black.

As to the fourth prong, Plaintiff has to show that Defendants treated similarly situated minority employees more favorably. Construing the evidence in Plaintiff's favor, James was provided "mentoring" by Chief Williams and/or the opportunity to assist with the Dearborn Department's day-to-day operations in a temporary position that was not posted or open to

others.  In addition, unlike any other applicant who applied for the Deputy Chief position, the

University's Human Resources Director, who was not on the search committee, personally

contacted James and discussed the position with her.

This Court therefore concludes that Plaintiff has made a sufficient showing regarding his

heightened burden as to his reverse race discrimination claim under Title VII.

Plaintiff has not, however, met his heightened burden as to his reverse sex discrimination

claim.  The decision to hire James was made by a man and Plaintiff has not explained how he

believes he could meet his showing as to his reverse sex discrimination claim under Title VII.

As such, the Court shall grant summary judgment in favor of Defendants as to that claim.

**II.      Can Plaintiff Meet His Burden As To Pretext?**

Once a plaintiff establishes such a prima facie case, the burden then shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for the challenged action.  If the

defendant articulates such a reason, then burden shifts to the plaintiff to demonstrate that the

defendant's proffered reason represents a mere pretext for unlawful discrimination.

Here, the challenged action addressed in Defendants' motion is Defendant not having

selected Plaintiff for the Deputy Chief position.  As their legitimate reason for not promoting

Plaintiff to that position, Defendants assert that "Plaintiff did not have the high level experience

of the candidates who were advanced to the phone interviews or the lieutenant-level and campus

experience of the two other internal candidates who were advanced."  (Defs.' Br. at 16).  Thus,

Defendants claim that James was selected for the position because she was better qualified than

Plaintiff.

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to

justify an adverse action by showing that the proffered reason: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003). The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.,* that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id.*

As the Sixth Circuit has explained, "[p]retext is a commonsense inquiry: did the employer make the decision at issue for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

The Court concludes that Plaintiff has submitted evidence that, *viewed in the light most favorable to Plaintiff*, is sufficient to create an issue of fact as to pretext. That evidence includes:

• Shortly after Chief Gordon retired, Renee Mainor in the University's Human Resources Department asked Plaintiff if he knew of any good candidates for the position of Chief, and after Plaintiff responded affirmatively, Mainor asked Plaintiff if he "knew of any good black candidates."

• Williams testified that when James was in the temporary position in Dearborn, he knew he was going to be creating a Deputy Chief position, and he mentored James to develop her to become a deputy police chief.

• Heatlie's report stating that Chief Williams said that Washington asked him to mentor James while she was in the interim position in Dearborn and that Washington selected James for the interim position.

- Williams testimony that he did not believe James was qualified to be a deputy police chief in the summer of 2014 because she lacked a college degree and because "I do not believe, and I've never believed that a person should be an executive in the police department without having a college degree."

- Heatlie's report stating that "When asked about the search process, Chief Williams stated that he wanted the successful candidate to have a Bachelor's degree and noted that Ms. James does not have a Bachelor's degree. Chief Williams says that despite his request, the University would not allow him to list a Bachelor's degree as a minimum qualification for the position." (*Id*. at Pg ID 388). Thus, the University's Human Resources Department would not allow him to include a requirement for the job that James could not meet.

- Heatlie's report stating that no member of the Search Committee had Plaintiff on their "short list" to proceed to a telephone interview, when in fact, it is undisputed that he was on Mainor's short list.

- James, the only female and black candidate among the finalists, was selected for the Chief Deputy position, despite her lack of a college degree, and despite Chief Williams's testimony about the importance of a degree to him, when all of the other finalists had college degrees, and two had masters degrees.

- Williams' denial that James was acting as interim Deputy Chief in Dearborn, despite testimony from others at the University that was the case.

- Mainor's testimony that one of the things that resulted in James getting an initial phone interview over Plaintiff was "[t]he fact that she was interim chief of police" at the Dearborn campus.

- Hutton's testimony that she was aware that James was black and was aware of her, as James had been "acting as interim police chief."

- Hutton's testimony that both her and Raveendran thought that James did not interview well in her phone interview and moved her forward "as a courtesy to her," because she had served in the interim position.

- Hutton's testimony that she did not think James was as qualified as others.

- Raveendran's testimony that she told others she did not think James was an "appropriate candidate," that she believed her phone interview was mediocre, and that "acquiesced" to putting James forward in the process, although she did not believe James was a qualified candidate.

27

- Raveendran's testimony about how it was apparent to them that Chief Williams would be making the final decision on the position and that the Search Committee had been asked to "cease and desist."

- Testimony that Grbic, who was not on the Search Committee but was the University's Director of Human Resources, and knew that James was black, personally contacted James after she withdrew from consideration and urged her to get back into consideration, because Grbic thought she was a qualified candidate based on James having been assisting Chief Williams.

- Grbic's e-mail stating "I have a clear front runner" for the position and suggesting that additional interviews were not necessary.

- Testimony about the manner in which Grbic changed the hiring process, midway through, such that the Search Committee members (two of whom did not think James did well in the phone interview and did not find her to be a qualified candidate) would not have in-person interviews, meaning the remaining candidates who had been picked for phone interviews (including James) would become finalists and sent to Chief Williams for a final decision by him without any further input from the Search Committee.

- That Williams, who said he thought a college degree was necessary for the position, and wanted to make it a mandatory requirement, but was not allowed to make it a mandatory requirement, ultimately selected the only finalist without a college degree, who was also the only black candidate, and was the same person that Washington had selected for the interim position and had asked him to mentor, as the new Chief Deputy.

- Plaintiff's testimony that when he asked Chief Williams why he was not given the opportunity to interview for the Deputy Chief position Williams "said that he had nothing to do with hiring."

Construing the above evidence in the light most favorable to Plaintiff, especially when that evidence is considered collectively, the Court concludes that Plaintiff has met his burden of establishing an issue of fact for trial as to pretext.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that the Court grants summary judgment in Defendants' favor as to Plaintiff's reverse sex

discrimination claims under Title VII. The motion is DENIED in all other respects.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: March 28, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 28, 2018, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager